United States Court of Appeals,

Fifth Circuit.

No. 91-6374.

GULF COAST INDUSTRIAL WORKERS UNION, Plaintiff-Appellant,

v.

EXXON COMPANY, U.S.A., Defendant-Appellee.

May 24, 1993.

Appeal from the United States District Court for the Southern District of Texas.

Before WILLIAMS, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Thomas Woods wants his job back. He lost it when he tested positive for cocaine, a clear violation of Exxon's Alcohol and Drug Use Policy and its after-care program. The district court refused to enforce an arbitration award instructing the company to reinstate him. The court held that the arbitrator's ruling was doubly defective because (1) it offended public policy by ordering the reinstatement of a proved drug abuser to his safety-sensitive position, and (2) the arbitrator exceeded his authority by relying upon Woods's post-discharge conduct. We agree with the district court on both counts and affirm the summary judgment in favor of Exxon.

## I. FACTS AND PRIOR PROCEEDINGS

This appeal is somewhat unusual for a disciplinary case in that the parties are in complete agreement regarding the underlying facts. For the most part, they are straightforward and largely stipulated.

Exxon Company, U.S.A. ("Exxon") employed Thomas W. Woods, the grievant, as a process technician at its Baytown, Texas petro-chemical refinery. Woods was not a desk-bound employee. As a process technician, he was freely transferable into assignments involving the supply of electricity, steam, water, and nitrogen to other parts of the plant. These volatile gases and liquids are produced

and handled at extremely high temperatures and pressures.[1]

Woods is a member of the Gulf Coast Industrial Workers Union ("Union" or "GCIWU") which, along with Exxon, is signatory to a collective bargaining agreement covering disputes between the parties. As with most agreements, it authorizes Exxon to discipline or discharge its employees for just cause and provides for final and binding arbitration of unsettled employee grievances. Article 26, Section B of the agreement provides: "The Company shall have the right to discipline and discharge employees for just cause. The commission of the offenses listed in Schedule C [including drug use] shall be just cause to render an employee liable to discharge on first offense."

Since January 1990, Exxon has also had in place a comprehensive Alcohol and Drug Use Policy that, while recognizing drug dependency as a treatable condition and encouraging troubled employees to seek help, "absolutely prohibit[s]" a worker from using or being under the influence of controlled substances on the premises. Any violation of the Policy is "cause for termination of employment." The Policy also requires workers who have completed programs for substance abuse or alcoholism to participate in a mandatory five-year after-care program. Among other things, the after-care contract requires total abstinence from all alcohol and non-prescription, controlled drugs. Employees are instructed what actions to take if a relapse occurs or if stress threatens to endanger the worker's sobriety. The contract also authorizes unannounced and periodic random drug/alcohol testing for the entire five-year duration of the after-care program. A positive test result is grounds for disciplinary action, including termination. If the employee follows the instructions, he may receive

---

[1]GCIWU argues that the record evidence contains no indication of Woods's duties at the refinery, but does not dispute Exxon's assertion that Woods was freely transferable to these potentially hazardous assignments. Although we are cautioned against usurping the arbitrator's task of finding facts and drawing inferences, our public policy inquiry permits us to consider this established evidence even though it may not have been considered by the arbitrator. *See United Paperworkers Intern. Union v. Misco, Inc.,* 484 U.S. 29, 44, 108 S.Ct. 364, 374, 98 L.Ed.2d 286 (1987); *Chrysler Motors v. International Union,* 959 F.2d 685, 689 n. 4 (7th Cir.1992).

We take this opportunity, however, to highlight a frustrating difficulty with this case. In discussing the record, both parties make numerous references to what transpired at the arbitration hearing. The hearing transcript, however, was never entered into the record and is not before us on appeal. Since both Exxon and the Union reference the arbitration hearing, we take judicial notice of those portions of the transcript to which the parties refer pursuant to FED.R.EVID. 201. *See generally* 10 MOORE'S FEDERAL PRACTICE § 201.60 (1988).

a second chance. If he fails to comply, he faces possible termination.

In April 1990, Woods voluntarily informed his supervisor at Exxon that he had recently participated in a 30-day, alcohol-rehabilitation program. In accordance with the stated Policy, Woods met with management to fashion his after-care program. Woods agreed to forego all alcohol and non-prescription drugs and to notify his supervisor or a counselor in case of relapse. In addition, Woods acknowledged that Exxon would perform random tests for drugs and alcohol throughout the five-year period. He signed an agreement, which provided in part:

> I have read Exxon's Alcohol and Drug Use Policy. The policy requires me to submit to periodic alcohol and drug testing at the Company's request. I understand I will be subject to periodic and unannounced alcohol and drug testing for a period of 60 months.... I understand that a positive alcohol or drug test result or refusal to submit to periodic testing is grounds for discipline as referenced in Exxon's Alcohol and Drug Use Policy.

The Policy then-effective provided that the "use ... of illicit or unprescribed controlled drugs ... is strictly prohibited and is grounds for termination."

Less than two months into the after-care program, Woods tested positive for cocaine.[2] In violation of the agreement, however, Woods had failed to notify anyone of his relapse. Moreover, he never admitted using cocaine until the test results came back positive, three days *after* the test was administered. Exxon immediately fired Woods for violating its Alcohol and Drug Use Policy and for breaching the after-care agreement in using cocaine and also in failing to report his relapse.

The Union filed a grievance contesting the termination. After the earlier steps in the grievance process failed, GCIWU invoked arbitration.[3] A single issue was submitted to the arbitrator: "Was Thomas W. Woods discharged for just cause and, if not, what is the proper remedy?" Noting that violation of the after-care agreement does not mandate automatic termination, the arbitrator held that summary discharge was unjustified and too harsh a penalty. Instead, he sustained the grievance and directed Exxon to reinstate Woods to his previous job without backpay contingent upon a negative

---

[2]The Union does not dispute the testing process used, the chain of custody, or the accuracy of the positive results. Moreover, the parties note that the findings do not indicate the degree of impairment, if any, when the drug was used, or the amount ingested.

[3]The parties stipulate that the grievance was properly before the arbitrator.

drug and alcohol screen.[4] The arbitrator said in his opinion that while there was "no question that the Company had just cause to discipline Woods," the grievant seemed "a good bet for successful rehabilitation."

When Exxon informed Gulf Coast that it did not intend to abide by the award, the Union instituted this suit to enforce the award. Exxon counter-claimed to vacate the award asserting that it violated sound principles of public policy in directing the reinstatement of Woods to his safety-sensitive position and also that the arbitrator exceeded his authority by basing his decision upon Woods's post-discharge conduct.

Upon cross-motions for summary judgment, the district court granted Exxon's requested relief and vacated the arbitration award. Gulf Coast timely appealed.

## II. DISCUSSION

In reviewing a summary judgment, we employ the same standard used by the district court. *Netto v. Amtrak,* 863 F.2d 1210, 1212 (5th Cir.1989). Since the facts are undisputed here, our sole mission is to determine whether "the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Accordingly, we review *de novo* the district court's order to vacate the arbitration award. *Forsythe Intern., S.A. v. Gibbs Oil Co. of Texas,* 915 F.2d 1017, 1020-21 (5th Cir.1990).

In making this determination, we recognize that federal courts defer to the arbitrator's resolution of the dispute "whenever possible." *Anderman/Smith Co. v. Tenn. Gas Pipeline Co.,* 918 F.2d 1215, 1218 (5th Cir.1990), *cert. denied,* --- U.S. ----, 111 S.Ct. 2799, 115 L.Ed.2d 972 (1991). Congress's decided preference for arbitration, as reflected in federal statutes regulating labor-management relations, establishes a standard of review that is highly deferential to the arbitrator's bargained-for judgment.

Notwithstanding this admonition, however, arbitration awards are not inviolate. We properly review arbitration awards to determine whether the award "stems from fraud or partiality; ...

---

[4]Given the lag between Woods's discharge and the arbitrator's decision, the practical effect of the award was a suspension of over one year.

concerns a matter not subject to arbitration under the contract; ... does not "dra[w] its essence' from the contract; ... or ... violates public policy." *Manville Forest Prod. v. United Paperworkers Intern.,* 831 F.2d 72, 74 (5th Cir.1987). In this background we consider the two alternative grounds Exxon asserts for vacating the award.

A. "Well Defined and Dominant" Public Policy[5]

Exxon argues the well-settled rule that, as with any other contract, arbitration awards are subject to challenge if they violate public policy. *United Paperworkers Intern. Union v. Misco, Inc.,* 484 U.S. 29, 42, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987). As the Supreme Court there explained, a court's refusal to enforce an award that is contrary to public policy is little more than "a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy." 484 U.S. at 42, 108 S.Ct. at 373.

*Misco* is the leading and dominant case setting out the rules applicable to reviewing arbitration awards on public policy grounds. In *Misco,* an employee at a paper converting plant was discharged after police apprehended him in a co-worker's car that was filled with marihuana smoke. The company asserted that being in a car with a lit marihuana cigarette violated the plant's rule against having an illegal substance on company property. The arbitrator upheld the grievance and ordered reinstatement. As in the instant case, the company attempted to vacate the arbitration award on several grounds, including the argument that reinstatement was offensive to public policy. The

---

[5]We reject the Union's argument that Exxon somehow waived its public policy argument by agreeing to arbitration and/or by not advancing it before the arbitrator. Under the terms of the collective bargaining agreement, the company had no choice but to arbitrate the grievance after earlier proceedings were exhausted. In any event, courts are the ultimate arbiters of public policy, not arbitrators. *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983); *see Iowa Elec. Light & Power v. Local Union 204,* 834 F.2d 1424, 1427 (8th Cir.1987) ("Because collective bargaining agreements do not formulate public policy, and arbitrators cannot consider matters not encompassed by the governing agreements, "the question of public policy is ultimately one for resolution by the courts.' ") (quoting *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183).

Indeed, *had* the arbitrator below relied upon public policy in reaching his decision, *that,* in some holdings, is considered error. *Local No. P-1236 v. Jones Dairy Farm,* 680 F.2d 1142, 1144 (7th Cir.1982) ("When an arbitrator bases his award on public policy considerations, he has overstepped his authority and the court may review the substantive merits of the award.").

district court agreed that the award must be set aside because it contravened general safety concerns that arise from the operation of dangerous machinery while under the influence of drugs, as well as state laws proscribing drug possession.[6] A divided panel of this Circuit affirmed, reasoning generally that workplace safety militated against restoring the worker to his hazardous job. The Court articulated the policy violated merely as "one against the operation of dangerous machinery by persons under the influence of drugs or alcohol." *Misco v. United Paperworkers International Union, AFL-CIO,* 768 F.2d 739, 743 (5th Cir.1985).

The Supreme Court reversed our decision which had upheld vacating the worker's reinstatement. The Court relied upon two reasons. First, our judicially-noticed public policy formulation, although "firmly rooted in common sense," was insufficient to support the Court's vacating the arbitration award because it ignored the requirement of *W.R. Grace* that a reviewing court must, as a necessary first step, identify with specificity the existing laws and legal precedents underlying its decision. *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). The Supreme Court re-emphasized in *Misco* that, when applying the narrow public policy exception, courts are forbidden to use imprecise notions of public policy which would allow ill-defined considerations to negate the rule favoring judicial deference. "At the very least," wrote Justice White, "an alleged public policy must be properly framed under the approach set out in *W.R. Grace,* and the violation of such a policy must be clearly shown if an award is not to be enforced." 484 U.S. at 43, 108 S.Ct. at 373. Second, even assuming the existence of such a policy, the record evidence in *Misco* failed to demonstrate that the employee had actually operated dangerous machinery while impaired.

The dictates of *Misco* must resolve the parties' public policy arguments. Although the public policy exception to our usual deference is not to be invoked lightly, a court may exercise its judicial power to abrogate a private agreement when, for example, it gives short shrift to the public's important yet unrepresented interests. When such violations are alleged, we enjoy more latitude in

---

[6]The employee operated a slitter-rewinder machine, a hazardous object that uses sharp blades to cut rolling coils of paper.

reviewing the arbitrator's decision. As the Supreme Court held in *W.R. Grace,* the question of public policy is wholly independent from the collective bargaining agreement and "is ultimately one for resolution by the courts." 461 U.S. at 766, 103 S.Ct. at 2183. In such instances, reviewing courts resolve the issue by "taking the facts as found by the arbitrator, but reviewing his conclusions de novo." *Iowa Elec. Light & Power v. Local Union 204,* 834 F.2d 1424, 1427 (8th Cir.1982); *E.I. DuPont de Nemours v. Grasselli Emp. Ass'n,* 790 F.2d 611, 617 (7th Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986).

In the instant case, the district court relied exclusively upon the "common sense" basis for refusing to reinstate Wood. While speaking generally about the public's interest in a safe workplace free of alcohol- and drug-abusers, the court did not ground its decision upon an articulated review of laws and legal precedents that frown upon the reinstatement of such employees.

We do not focus upon whether Wood's underlying conduct violates public policy. It obviously does. Rather, under *Misco* the courts must detail specifically the official measures establishing the policy upon which it relies. After such an inquiry, we hold that it offends public policy for Woods, an employee who occupies a safety-sensitive position, to retain his job upon testing positive for cocaine while on the job and after having breached his company's drug abuse policy on two occasions—first when he broke his pledge of abstinence, and second when he failed to disclose his relapse. To be sure, public policy clashes unmistakably with Woods's use of a controlled substance. We find that it is contrary to the arbitration award as well.[7]

---

[7]In a footnote, the *Misco* Court declined to address the issue of whether invocation of the public policy doctrine requires a showing that the "award itself violates a statute, regulation, or other manifestation of positive law, or compels conduct by the employer that would violate such a law." 484 U.S. at 45 n. 12, 108 S.Ct. at 374-75 n. 12. Legal authority generally holds that a court need not find that the award itself is illegal before overruling an arbitrator on public policy grounds. *See* R. GORMAN, LABOR LAW—UNIONIZATION AND COLLECTIVE BARGAINING 597 (1982) (stating that an award may be vacated when it, "although not requiring illegal conduct, is said to be inconsistent with some significant public policy"); *see also, e.g., Grasselli,* 790 F.2d at 616; *Iowa Elec.,* 834 F.2d at 1427-28 n. 3; *U.S. Postal Ser. v. American Postal Workers Union,* 736 F.2d 822, 824 (1st Cir.1984). *But see, e.g., American Postal Workers v. United States Postal,* 789 F.2d 1, 8 (D.C.Cir.1986) (upholding an award reinstating a worker who admitted to mishandling mail because reinstatement did not violate positive law or otherwise compel illegal conduct). Although these authorities, with the exception of *Iowa Electric,* are pre-*Misco,* nothing in the Supreme Court's decision mandates a contrary result. Indeed, refusing to vacate an arbitration award unless it violates some manifestation of positive law would be difficult to square

There are countless statutes, regulations, company guidelines, and judicial decisions that pronounce the emphatic national desire to eradicate illicit drugs from the workplace. Every day, legislatures, agencies, and courts reflect our intolerance of substance abusers and the astronomical costs—both human and financial—associated with their behavior. As other cases have done, we proceed to highlight the various legal sources reflecting our nation's "well defined and dominant" desire for a drug-free society.

1. *federal statutes*

The 1988 Drug-Free Workplace Act, 41 U.S.C. §§ 701-707, post-dates *Misco.* It mandates drug-free workplace requirements for federal contractors. Under this Act, to which Exxon is bound as a government contractor, "[n]o person ... shall be considered a responsible source ... for the purposes of being awarded a contract for the procurement of any property or services of a value of $25,000 or more from any Federal agency unless such person has certified to the contracting agency that it will provide a drug-free workplace[.]" *Id.* § 701(a)(1). The Drug-Free Workplace Act also requires private employers with federal contracts to (1) publish a statement notifying their workers that the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance is prohibited in the workplace, (2) notify the employees that their continued employment hinges on compliance with the policies outlined in this statement, and (3) establish a drug-free awareness program to inform their employees of the "dangers of drug abuse in the workplace." *Id.* § 701(a)(1)(A)-(D). A company's failure to comply with the Act subjects the company's federal contract to possible termination.

In the case of grievant, Thomas Woods, there was no showing that he possessed or used cocaine on the premises. But this is no longer a critical distinction. According to Exxon, it is also bound as a government contractor to comply with the Defense Department's regulations mandating a drug-free workplace. 48 C.F.R. 223.5 (1992) (stating the Department's policy "to ensure that its contractors maintain a program for achieving a drug-free work force" since a contractor's employee's

---

with "the more general doctrine ... that a court may refuse to enforce contracts that violate law *or* public policy." *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183 (emphasis added).

use of illegal drugs "*at any time* " can "(1) Impair their ability to perform tasks that are critical to proper contract performance [and];  (2) Increase the potential for accidents and for failures that can pose a serious threat to the national security, health, and safety[.]") (emphasis added).  A companion regulation voices a similar position:

> Contractors shall adopt appropriate personnel procedures to deal with employees who are found to be using drugs illegally.  Contractors shall not allow any employee to remain on duty or perform in a sensitive position [defined in part as a job impacting health or safety or requiring a high degree of trust or confidence] who is found to use illegal drugs until such times as the Contractor, in accordance with procedures established by the Contractor, determines that the employee may perform in such a position.

48 C.F.R. 252.223-7004(d) (1992).

The recently enacted Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, is also instructive.  While broadening employment opportunities for millions of disabled workers, the ADA affirmatively excludes from protection persons who are using drugs:  "For purposes of this chapter, the term "individual with a disability' does not include an individual who is currently engaging in the illegal use of drugs[.]"  *Id.* § 12114.  By placing drug users outside the ADA's protective ambit, Congress explicitly refused to open employment doors for them.

2. *state statutes*

Statutes enacted by Texas further define the dominant public policy favoring a drug-free society.  For example, Texas Revised Civil Statutes Annotated article 8308-7.10(a) (West Supp.1993), styled Policies for elimination of drugs in the workplace, mandates the following: "Each employer who has 15 or more employees and who maintains workers' compensation insurance coverage shall adopt a policy designed to eliminate drug abuse and its effects in the workplace." Another statutory provision, which requires state agencies to report equal employment opportunity data concerning handicapped persons to the governor's office, specifically excludes from the definition of "handicapped person" anyone "who is addicted to the use of alcohol or to a drug or other controlled substance." TEX.REV.CIV.STAT.ANN. art. 6252-16b, § 1 (West Supp.1993).  Likewise, the state's Commission on Human Rights Act, enacted "to secure for persons within the state freedom from discrimination in certain transactions concerning employment ... [and] to preserve the public safety, health, and general welfare," affirmatively states that "disability" does not include "a person

with a current condition of addiction to the use of alcohol or any drug or illegal or federally controlled substance[.]"  TEX.REV.CIV.STAT.ANN. art. 5221k, §§ 1.02(2) and 2.01(4)(A) (West Supp.1993).

3. *various regulations*

Additionally, we refer to examples of the innumerable regulations from various governmental agencies concerning drug testing programs as further demonstrating our current national policy.  The Department of Transportation has promulgated comprehensive regulations arguably applicable to Woods mandating anti-drug programs for workers stationed on petro-chemical pipelines.  49 C.F.R. § 199 (1991).  Many other regulations echo the concern.  *See, e.g.,* Control of Alcohol and Drug Use, 49 C.F.R. § 219 (1992) (Federal Railroad Administration);  Federal Aviation Administration Drug Testing Program, 14 C.F.R. § 121, Appendix I (1992);  Fitness For Duty Programs, 10 C.F.R. § 26 (1993) (Nuclear Regulatory Commission);  Department of Defense Drug Abuse Testing Program, 32 C.F.R. § 60 (1992);  Procedures for Transportation Workplace Drug Testing Programs, 49 C.F.R. § 40 (1992) (Department of Transportation).

More generally, pursuant to a presidential initiative to establish drug-free workplaces, Executive Order No. 12564 (*reprinted in* 5 U.S.C. § 7301 note) requires *every* federal executive agency to establish a random testing program for civilian employees who hold safety- and security-related positions.[8]

4. *judicial decisions*

An abundance of judicial decisions condemn the presence of drugs in the workplace.  *Misco,* for example, although the Supreme Court took issue with the failure to formulate the invoked policy

---

[8]The Order, which forbids illegal drug use by federal employees both on and off duty, specifically recognized that,

> Drug use is having serious adverse effects upon a significant proportion of the national work force and results in billions of dollars of lost productivity each year;

> The Federal government, as the largest employer in the Nation, can and should show the way towards achieving drug-free workplaces through a program designed to offer drug users a helping hand and, at the same time, demonstrating to drug users and potential drug users that drugs will not be tolerated in the Federal workplace[.]

with precision, noted that our view that public policy condemns the operation of dangerous machinery by workers using drugs or alcohol "is firmly rooted in common sense." 484 U.S. at 44, 108 S.Ct. at 374; *see also, Oil Workers Loc. 4-228 v. Union Oil Co. of Cal.,* 818 F.2d 437, 442 (5th Cir.1987) (recognizing this Circuit's strong public policy against the operation of dangerous machinery by persons using drugs or alcohol). Other jurisdictions are in accord. In a case involving a papermill worker who possessed marihuana on company premises, the First Circuit specifically "conclude[d] that there is a well-defined public policy against the use of drugs in the workplace." *S.D. Warren Company v. United Paper Workers Int'l Union,* 815 F.2d 178, 186 (1st Cir.) ("*Warren I* "), *vacated,* 484 U.S. 983, 108 S.Ct. 497, 98 L.Ed.2d 496 (1987), *on remand,* 845 F.2d 3 (1st Cir.) ("*Warren II* "), *cert. denied,* 488 U.S. 992, 109 S.Ct. 555, 102 L.Ed.2d 582 (1988). In language pertinent to the case before us, the Court observed:

> There are laws against the sale and use of drugs enacted by all states, ... and the sale and use of drugs is a serious offense under federal laws. [citations omitted]. Furthermore, the nation has focused on the corrosive consequences of drug sale and use and has devoted itself to their eradication. In particular, the work shop is a place where such usage is abominable not only because of the health hazard it creates, but also because it creates an unsafe atmosphere and is deteriorative of production, the quality of the products, and competition.

815 F.2d at 186.[9]

As we have noted previously, petro-chemical refineries are dangerous places; there is no margin for error. *See Union Oil,* 818 F.2d at 439, 441 n. 3 (affirming the arbitrator's emphasis on "the danger inherent in the oil refinery work environment" where "fires and explosions often occur ... with calamitous and costly results"). Woods's duties as a process technician at the refinery involved the potential handling of high-pressure and high-temperature liquids and gases. Such

---

[9]Upon remand for further consideration in light of *Misco,* the First Circuit in *Warren II* did not reaffirm specifically the *Warren I* holding that vacated the arbitration award on public policy grounds. Instead, the Court chose not to revisit the public policy issue and "assume[d] without deciding" that *Misco* foreclosed the alternate public policy basis for its earlier decision. *Warren II,* 845 F.2d at 7. Instead, *Warren II* relied upon the arbitrator's usurpation of authority in ignoring the contract's plain language that granted management the sole right to discharge employees for cause and removed from the arbitrator the authority to fashion a remedy once certain rules were broken. It was careful, however, to highlight a post-*Misco* case from the Eighth Circuit which relied upon *Warren I* as a basis for refusing to enforce an arbitration award on public policy grounds. *See Iowa Elec.,* 834 F.2d at 1428.

assignments have the capacity to place thousands of people, as well as the surrounding environment, at risk.[10]  As Arbitrator Grimes remarked in an arbitration involving a petro-chemical facility,

> [Refineries have] the responsibility to the community, its owners and its employees to provide a safe work environment.  Given the nature of the products handled in a refinery, particularly those in operations where t he most volatile and hence more explosive gases and fluids are produced, an accident which can result from a seemingly insignificant misstep can produce a catastrophe.

*Marathon Petroleum Co.,* 89 Lab.Arb. 716, 722 (1987).

Woods's position is rightly characterized as safety-sensitive.  And federal courts have with some frequency overturned awards of reinstatement on public policy grounds where, as here, public safety was implicated.  *See, e.g., Amalgamated Meat Cutters v. Great Western Food Co.,* 712 F.2d 122, 125 (5th Cir.1983) (reversing an arbitrator's reinstatement of an over-the-road truck driver who drank liquor while on duty); *Iowa Elec.,* 834 F.2d at 1427-30 (refusing to reinstate a nuclear power plant employee who had compromised a reactor safety system, despite the arbitrator's decision that discharge was too harsh a sanction); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,* 861 F.2d 665, 666-68 (11th Cir.1988) (striking down an award t hat reinstated a pilot who flew while intoxicated), *cert. denied,* 493 U.S. 871, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989); *Georgia Power Co. v. IBEW, Local 84,* 707 F.Supp. 531, 533-34 (N.D.Ga.1989) (refusing to reinstate a power company employee who was a chronic drug user and who was responsible for monitoring various meters and gauges to ensure that high pressure equipment did not overheat), *aff'd,* 896 F.2d 507 (11th Cir.1990).

The Supreme Court has approved of drug testing for employees in safety-sensitive jobs. *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 621, 109 S.Ct. 1402, 1415, 103 L.Ed.2d 639 (1989) (noting that Government has a strong interest in preventing railroad personnel "from using alcohol or drugs while on duty, or while subject to being called for duty" so as to ensure the safety of the public and of the employees themselves); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 670, 109 S.Ct. 1384, 1393-94, 103 L.Ed.2d 685 (1989) (recognizing that

---

[10]The Baytown refinery operates in a community of over 60,000 residents.  Moreover, according to Exxon, "the refinery sits on the banks of the Houston Ship Channel, an environmentally sensitive waterway that feeds into the Gulf of Mexico."

Government's interest in guarding against on-the-job impairment justifies the imposition of suspicionless drug-testing of certain customs agents).

We hold that the above-cited authorities, viewed particularly in light of Woods's efforts to conceal his drug use, represent a valid expression of a "well defined and dominant" public policy. The delineation of public policy does not fall short by consisting only of "general considerations of supposed public interests."

To be sure, various courts have adhered to a narrow construction of the public policy exception and have refused to disturb an arbitrator's bargained-for judgment on public policy grounds. GCIWU relies primarily upon two decisions for its position that Woods's reinstatement does not breach public policy. First, it cites *Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173, Int'l Ass'n of Machinists and Aerospace Workers,* 886 F.2d 1200, 1216-17 (9th Cir.1989) (*en banc*), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990). In *Stead,* a plurality of the *en banc* Ninth Circuit found no dominant public policy barring the reinstatement of an auto mechanic who recklessly failed to tighten a car's lug bolts. Drug use was not involved in the case. In a severely split decision, the *Stead* plurality held that the materials relied upon by the original panel, California code provisions regarding auto safety and maintenance, were insufficient to form an explicit, well-defined, public policy. Without expressly saying so, the plurality opinion also strongly suggests that unless the award itself constitutes a clear violation of positive law, courts are powerless to intervene—a question left purposefully unresolved by the Supreme Court in *Misco,* 484 U.S. at 45, n. 12, 108 S.Ct. at 374-75, n. 12, and expressly rejected by this Court.

Moreover, the plurality states a rule of construction that a grievant's "amenability to discipline" cannot be second-guessed by a reviewing court, whatever the policy issue at stake. *Stead,* 886 F.2d at 1213 (citing dicta from *Misco,* 484 U.S. at 44-45, 108 S.Ct. at 374). We reject such a restrictive test, which would have the practical effect of ousting the courts of jurisdiction and abdicating the public policy question entirely to arbitrators. Under the plurality's problematic decision, if an arbitrator finds the discharged employee amenable to discipline and therefore unlikely to breach a properly-framed public policy in the future, such a determination would be unreviewable.

Our reading of *Misco* does not compel such a "hands-off" policy. The plurality's rule of no judicial power to evaluate amenability does not comport with *W.R. Grace* 's teaching, acknowledged in *Misco,* that " "the question of public policy is ultimately one for resolution by the courts.' " 484 U.S. at 43, 108 S.Ct. at 373 (quoting *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183). The valuable principle of deference to arbitration does not take us so far.

Second, the Union cites *Northwest Airlines v. Air Line Pilots Ass'n, Int'l,* 808 F.2d 76 (D.C.Cir.1987), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988), in which the D.C. Circuit ordered the reinstatement of a commercial airline pilot who had admitted to flying his plane while intoxicated. But *Northwest Airlines* includes a unique factual distinction. In that case, the Federal Aviation Administration ("FAA") had recertified the pilot after he had completed an alcohol rehabilitation program. FAA recertification, a condition the arbitrator made integral to his reinstatement award, embodied a specific determination by the regulator itself that the pilot was "fit and qualified to fly." 808 F.2d at 83. A court would certainly be hard-pressed to oppose reinstatement where the regulatory body charged with ensuring workplace safety agrees to it. That did not happen in the instant case. Arbitrator Helburn did not condition his reinstatement of Woods upon a specific determination by a governmental body that Woods was fit to resume his duties at the refinery.

This is not just the usual case of an arbitrator's reinstatement of an errant employee. We view as of the utmost importance in this case the fact that Woods tested positive for a drug as critical and powerful as cocaine when he had already been through rehabilitation and was in a sense on probation. Then, he did not notify anyone of his relapse as required, and only later did he admit his serious breach when confronted with the test results. A conclusion requiring "another chance" and further rehabilitation is on its face extremely risky under these unusual and uncommon circumstances. As Arbitrator Helburn himself recognized, "Discharge is appropriate where the employer can demonstrate the previous use of progressive/corrective discipline to no avail." The reinstatement of such a worker is not compelled by *Misco,* and we find no judicial decision requiring upholding an arbitrator's awarding of reinstatement to such an employee.

The record does not show that Woods was impaired while on duty or that he used cocaine on Exxon's premises. This circumstance, however, does not control in the light of Woods's sensitive position and his attempts to conceal his drug use. Woods's duplicity in hiding his violation of the after-care agreement obviously increases the risk of future violations. Also, the arbitrator ordered Woods be restored to his previous safety-sensitive position. Exxon was not allowed to consider placing him in a less dangerous assignment. In *Misco,* the Supreme Court made reference to the provision of the award that permitted the company to transfer the grievant to a different equivalent job, remarking that it was unclear that the worker "would pose a serious threat to [himself and others] in every job for which he was qualified." 484 U.S. at 45, 108 S.Ct. at 374. In the case before us, no such discretion exists; Woods was ordered to be returned to his former position as a process technician.[11]

As stated above, courts are the ultimate arbiters of public policy in the arbitration context. This case presents us with public policy favoring a safe and drug-free workplace as expressed in countless governmental directives and judicial decisions. Mr. Woods was a employee who tested positive for cocaine while on the job, who had already taken advantage of his company's rehabilitation-focused treatment program only to breach the after-care contract on two occasions (excusing his failure to report the relapse only because he felt "too embarrassed" by it), and who had refused to admit his drug use until the test results later came back positive. We conclude that compelled continued employment of Woods in a safety-sensitive position is sufficient to represent a plain violation of "well defined and dominant" public policy. The summary judgment in favor of Exxon is properly supported on this basis.

---

[11]Other courts have noted that companies could face extraordinary liability if, despite proven instances of deception regarding the company's drug policy, they nevertheless restored violators to their sensitive positions. *See, e.g., Georgia Power,* 707 F.Supp. at 536 n. 4, 538 (remarking that reinstatement could potentially expose the employer to liability for damages caused by a worker's future drug use). *See also, e.g., Usery v. Marquette Cement Mfg. Co.,* 568 F.2d 902, 910 (2d Cir.1977) (stating that employers are liable for those hazards caused by their employees if the dangers were foreseeable and preventable).

B. Consideration of Post-Discharge Conduct[12]

As an alternative basis for vacating the arbitrator's award, Exxon also contends that the arbitrator below improperly considered "post-discharge good works" as a basis for reinstating Woods. As a result, argues Exxon, the arbitrator exceeded the scope of his authority under the contract. Specifically, the arbitrator considered and relied upon several assertions regarding Woods's post-discharge behavior, including (1) his post-relapse drug and alcohol abstinence, (2) his ability to hold a job, (3) his realization that he must live "one day at a time." In sum, the arbitrator considered these factors in making his just cause determination and in concluding that Woods represented "a good bet for successful rehabilitation so that discharge is not justified at this point in his treatment." For its part, the Union urges strenuously that an arbitrator may properly condition his just cause determination on numerous factors, even those that arise after termination.

In considering this issue, we are guided by our prior recognition that, to "draw its essence" from the contract, "an [arbitrator's] award must have a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement.... [T]he award must, in some logical way, be derived from the wording or purpose of the contract[.]" *Loc. U. 59, Int. Bro. of Elec. Wkrs. v. Green Corp.,* 725 F.2d 264, 268 (5th Cir.) (citation omitted), *cert. denied,* 469 U.S. 833, 105 S.Ct. 124, 83 L.Ed.2d 66 (1984).

The inquiry is straightforward: should the arbitrator have relied upon evidence of events that occurred after Woods's discharge? Once again, the Supreme Court's decision in *Misco* provides important guidance. In *Misco,* the arbitrator *refused* to consider evidence unknown to the company at the time the grievant was fired. The Court noted that the arbitrator's refusal was merely a construction of what the agreement required when deciding discharge cases: "an arbitrator was to look only at the evidence before the employer at the time of discharge. As the arbitrator noted, this approach was consistent with the practice followed by other arbitrators." 484 U.S. at 39-40, 108

---

[12]GCIWU argues that Exxon has waived its objection to the arbitrator's consideration of Woods's post-discharge conduct by not lodging a proper objection either at the grievance hearing or in its post-hearing brief. But given that arbitrators typically receive evidence liberally and do not feel constrained by strict applications of the rules of evidence, Exxon is not precluded from arguing this point on appeal in a *de novo* review.

S.Ct. at 371.  The Court elaborated in an accompanying footnote:

> Labor arbitrators have stated that the correctness of a discharge "must stand or fall upon the reason given at the time of discharge," *see, e.g., West Va. Pulp & Paper Co.,* 10 Lab.Arb. 117, 118 (1947), and arbitrators often, but not always, confine their considerations to the facts known to the employer at the time of the discharge.  O. Fairweather, Practice and Procedure in Labor Arbitration 303-306 (2d ed. 1983);  F. Elkouri & E. Elkouri, How Arbitration Works 634-635 (3d ed. 1973).

484 U.S. at 40 n. 8, 108 S.Ct. at 371-72 n. 8.

In the instant case, Article Twenty-Six of the applicable collective bargaining agreement provides that Exxon "shall have the right to discipline and discharge employees for just cause." Arbitrator Helburn was presented with this stipulated issue:  "Was Thomas W. Woods discharged for just cause and, if not, what is the appropriate remedy?"  The first part of the question is worded in the past tense.  It is equivalent to asking, "Did Exxon possess just cause on June 15, 1990 to terminate Thomas W. Woods?"  Upon a careful review of the applicable legal principles and the terms of the parties' collective bargaining agreement, which strips the arbitrator of authority "to alter or add to it in any way," we hold that the arbitrator should have confined his considerations only to the facts as they existed at the time Exxon made its termination decision.

This decision is supported by most of the caselaw.  As noted above, the *Misco* Court recently affirmed an arbitrator's refusal to consider evidence not relied upon by the company at the time of discharge.  484 U.S. at 39-40, 108 S.Ct. at 371.  The Eleventh Circuit is in accord.  In *Delta Airlines,* which concerned a pilot terminated for flying while intoxicated, the court held that one basis for its reversal of the arbitration board's reinstatement award was the board's improper consideration of the grievant's post-discharge conduct.  Specifically, the Arbitration Board, while finding that the pilot "did commit a dischargeable offense," nonetheless found an absence of just cause for the termination in part because, "after discharge and after rejection of his grievance," the alcoholic pilot had sought rehabilitation.  861 F.2d at 668, 669.  For guidance, the Court turned to one of its previous decisions, *Butterkrust Bakeries v. Bakery, Conf. & Tobacco Wkrs.,* 726 F.2d 698 (11th Cir.1984), and reasoned:

> *Butterkrust* holds that an arbitrator is bound to decide just cause for discharge, *vel non,* at the time of discharge.  The arbitrator's responsibility is discharged upon his determination of the existence of just cause.  If this finding has been made, *the arbitrator is*

> *not authorized to employ "his own brand of industrial justice" and decide what post discharge good works would entitle the properly discharged employee to rehire.* While the arbitrator ... may be an actual or potentially excellent personnel expert, his opinion as to what employment opportunities one ought to have if he or she, after discharge, constructively addresses the problems that lead to discharge is not pertinent to the arbitration duties. The arbitrator's effort to impose his views on that subject upon the parties to the arbitration amounts to his basing his decision upon "his own brand of industrial justice," which is forbidden.

*Delta Airlines,* 861 F.2d at 669 (emphasis added).

*Mobil Oil Corp. v. Independent Oil Workers Union,* 679 F.2d 299 (3d Cir.1982), points to an important application of the basic principle. *Mobil* concerned a mentally disturbed grievant who was terminated because he fought on the job and had a poor work record. At the time Mobil discharged the worker, it was unaware of his mental disorder. The arbitrator nevertheless concluded that "cause" should be construed objectively and not governed by the subjective standard of what Mobil actually knew when it fired the employee. The arbitrator considered an array of information, including medical and other evidence, that came to light after the discharge. The Court upheld consideration of this evidence by the arbitrator although it was not within Mobil's knowledge on the date the grievant was fired. The Court, however, properly stressed its continued adherence to the rule that "an arbitrator may not rely on an employee's subsequent rehabilitation to order reinstatement." *Id.* at 303 (citing *American Honda Motor Co. v. Local 585, UAW,* No. 79-1231, (E.D.Pa. July 20, 1979), *aff'd mem.,* 615 F.2d 1352 (3d Cir.1980)). The established rule was not violated because the arbitrator considered only later-discovered evidence which established the situation at the time of discharge, not evidence of later changes in the situation.

In the instant case, instead, the arbitrator relied heavily upon circumstances regarding Woods's post-discharge rehabilitation efforts. Such reliance was a departure from his authority under the contract. The Union looks principally to a Ninth Circuit decision for the proposition that an arbitrator can rightfully consider post-discharge conduct in reaching his decision. *See Intern. Ass'n of Machinists v. San Diego Marine,* 620 F.2d 736 (9th Cir.1980). But that case actually favors Exxon's position. In *San Diego Marine,* the company argued that a reinstatement award should be vacated because the arbitrator considered evidence regarding the company's improper behavior at a post-termination grievance meeting. On appeal, the Ninth Circuit refused to disturb the arbitrator's

reinstatement award because "[u]nlike the arbitrator in [*Delta Lines, Inc. v. Teamsters Local 468,* 66 Cal.App.3d 960, 136 Cal.Rptr. 345 (1977) ] ... this arbitrator did not state that he was reaching his decision *because* of post-termination conduct of the Company. Rather, the arbitrator seems to have reached his conclusion in light of all the circumstances surrounding the discharge." *Id.* at 739 (emphasis added). The arbitrator's decision was upheld because it was not *based* upon the company's post-termination conduct.

Although we are mindful of the Supreme Court's time-honored admonition that merely an "*inference* that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award," *Steelworkers v. Enterprise Wheel & Car, Corp.,* 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) (emphasis added), the arbitrator's decision in this case goes beyond mere surmise or intimation. He did properly consider Woods's long-time record with Exxon as a basis for reinstatement. His principal basis for believing Woods would benefit from a lesser sanction, however, was stated this way: "I am impressed that he testified honestly and *since his relapse* he seemingly has learned better how to deal with his environment. He has attended AA meetings, held a job and learned to live "one day at a time,' which he must do if he is to control his dependancy [sic]." (emphasis added). Such heavy reliance upon Woods's post-relapse behavior defeats the normal presumption urging us to uphold an award when its underlying reasoning is merely ambiguous. 363 U.S. at 598, 80 S.Ct. at 1361.

Accordingly, we conclude that the arbitrator's award must be vacated also on this alternative ground.

## CONCLUSION

On the facts before us, we conclude that reinstatement of a worker to his safety-sensitive position after having breached his after-care agreement would eviscerate the "well defined and dominant" public policy underlying our nation's efforts to promote a workplace free of drugs and alcohol. This is particularly true concerning industries that, like petro-chemical refineries, have the capacity to impact public safety. Moreover, the arbitrator erred in basing his decision upon several conclusions concerning Woods's post-termination conduct. In exercising such reliance, Arbitrator

Helburn exceeded his proper, contracted-for authority.

The arbitrator's award reinstating Thomas Woods was properly set aside.

AFFIRMED.

* * * * * *