# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-20435

United States Court of Appeals
Fifth Circuit

**FILED**
July 16, 2020

Lyle W. Cayce
Clerk

VANTAGE DEEPWATER COMPANY; VANTAGE DEEPWATER
DRILLING, INCORPORATED,

      Plaintiffs - Appellees

v.

PETROBRAS AMERICA, INCORPORATED; PETROBRAS VENEZUELA
INVESTMENTS & SERVICES B.V.; PETROLEO BRASILEIRO S.A.-
PETROBRAS,

      Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before SOUTHWICK, COSTA, and DUNCAN, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

This is an appeal of a district court's order confirming a $622 million arbitration award. The defendants argue that, because public policy precludes enforcing the award, it should have been vacated. The defendants also argue that the district court erred in denying the defendants' discovery motions.

We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties in this case are oil and gas companies, incorporated and based in different countries. Vantage Deepwater Company is a Cayman Islands company; Vantage Deepwater Drilling, Inc., is a Delaware corporation

with its principal place of business in Texas (collectively, "Vantage"). Vantage operates a fleet of oil rigs. Petrobras Venezuela Investments & Services B.V. is a Dutch company; Petrobras America Inc. is a Delaware corporation; and Petróleo Brasileiro S.A. – Petrobras is a Brazilian company (the three collectively, "Petrobras").

In 2007, Petrobras had not listed Vantage as an approved drilling service contractor. In exchange for help procuring drilling-services contracts, Vantage's largest shareholder and board member Nobu Su, also known as Hsin-Chi-Su, agreed to pay approximately $30 million in bribes, distributed as kickbacks to three individuals: Jorge Zelada, Eduardo Musa, and Hamylton Pinheiro Padilha, Jr. By 2016, a Brazilian criminal investigation revealed the bribery was part of a larger scheme dubbed *Lava Jato* (Operation Carwash). Zelada, Musa, and Padilha were convicted of crimes arising from the scheme in Brazil. Su and Vantage's former CEO, Paul Bragg, also were indicted in Brazil, but briefing states they have not returned to that country. Vantage told United States regulators in 2017 that it had discovered some evidence that its then-CEO Bragg and then–board member John O'Leary were at least willfully blind to Padilha and Su's bribery. In 2018, the United States Department of Justice entered a non-prosecution agreement with Petrobras relating to the fraud. The Justice Department stated that multiple Petrobras individuals had received bribes to assist Vantage in winning the drilling contract with Petrobras.

In 2009, Vantage Deepwater Company and Petrobras Venezuela executed the Agreement for the Provision of Drilling Services ("DSA"). Under the DSA, Vantage would perform offshore drilling services for Petrobras for an eight-year term. Also in 2009, Petróleo Brasileiro executed a Form of Payment and Performance Guaranty, in which it "unconditionally, absolutely and irrevocably guarantee[d]" Petrobras Venezuela's obligations under the DSA.

No. 19-20435

To fulfill Vantage's obligations, Vantage's parent company purchased an ultra–deepwater oil rig called the *Titanium Explorer* for over $948 million. The DSA's eight-year term began in December 2012.

In August 2013, a Brazilian magazine published an article claiming that a Vantage shareholder had paid $14.5 million to João Augusto Henriques, a lobbyist for the Brazilian Democratic Movement Party, to secure a drilling contract with Petrobras. Petrobras then conducted an internal investigation into the allegations. The investigatory report recorded attempts to interview Henriques, but in the end, the report could not "prove the veracity" of the bribery allegations. The report acknowledged, however, that "Petrobras's good practices ceased to be observed" and that there were "deficiencies in the process of contracting." The report suggested submitting the report to Brazilian prosecutors. The report also found that the DSA was "at market value." A few months later, the parties executed the Second Novation and Third Amendment, in which they reaffirmed that the DSA was binding.

About two years into the DSA's term, in October 2014, Vantage and Petrobras executed the Third Novation and Amendment Agreement. It was this agreement that included an arbitration clause, which provided that any disputes arising out of the DSA as amended by the Third Novation would be "exclusively and finally resolve[d]" through arbitration conducted by the International Center for Dispute Resolution of the American Arbitration Association ("AAA") in Houston, Texas. Vantage and Petrobras agreed that the arbitrators would have the "power to rule on objections concerning jurisdiction, including the existence or validity of [the] arbitration clause and existence or the validity of" the DSA. The Third Novation also stated that "[t]he parties waive irrevocably their right to any form of appeal, review or recourse to any court or other judicial authority, to the extent that such waiver may be validly made."

3

No. 19-20435

The DSA prohibited terminating the contract for convenience but allowed termination if Vantage materially breached or failed to provide its services.  In August 2015, several years before the end of the DSA's term, Petrobras terminated the DSA.  Immediately thereafter, Vantage demanded arbitration pursuant to the Third Novation, claiming over $450 million in expectancy damages and over $800 million in reliance damages.  The asserted expectancy damages were based on lost profit calculations, and the asserted reliance damages were primarily based on Vantage's incurring debt to acquire the *Titanium Explorer*.

Petrobras responded by arguing it had terminated the DSA for operational reasons because Vantage materially breached the contract.  Petrobras also argued that the DSA was procured through bribery and corruption, making the agreement invalid.  Petrobras claims it first had actual knowledge of the bribery only in 2015, after Padilha pled guilty to his role in the scheme in a Brazilian court.  Vantage claims that Petrobras actually had knowledge after the magazine article was published in 2013, and that Petrobras ratified the DSA when it agreed to the Third Novation.

Throughout 2016, the parties and the arbitration tribunal, once it was selected, addressed a variety of procedural issues.  The tribunal consisted of three arbitrators.  After Vantage's first pick, David Keltner, was removed due to a conflict of interest, Vantage appointed Charles N. Brower, who is a judge on the Iran–United States Claims Tribunal, an international arbitral tribunal.  Petrobras appointed Mr. James Gaitis.  Keltner and Gaitis selected as chairman Professor William Park of Boston University.

The tribunal held evidentiary hearings between May 16 and June 1, 2017.  On June 7, Petrobras moved the AAA to disqualify and remove Judge Brower.  Petrobras gave four reasons to support its motion.  First, Petrobras asserted that Brower appeared partial because he "continuously made

4

inappropriate, off-the-record comments under his breath while [Petrobras's] witnesses were being cross-examined, and while [Petrobras's] counsel cross-examined [Vantage's] witnesses." Second, Petrobras asserted that Brower continually and "improperly advocated" for Vantage including by cross-examining one of Petrobras's fact witnesses for nearly two hours. Third, Petrobras asserted that during the hearing Brower incorrectly summarized the direct evidence of bribery, which must have been because he was either "intentionally ignoring other evidence" or "intentionally misstating the evidence related to bribery and corruption." Last, Petrobras asserted that Brower frequently dozed off during the hearing, indicating that he could not diligently perform his duties.

The AAA spent some time investigating the assertions of bias. Chairman Park's billing statement, for example, showed he communicated with the AAA for about five and a half hours. The AAA denied the motion in a sentence.

The final award was issued on June 29, 2018. A majority of the arbitrators — Chairman Park and Judge Brower — awarded Vantage over $620 million. Gaitis wrote a one-paragraph dissent that claimed unfairness in the proceedings:

> I object to, and I dissent from, the tribunal majority's Final Award. This Objection and Dissent is based not only on my differing conclusions regarding the merits of the parties' dispute, but also on my belief and conclusion that the prehearing, hearing, and posthearing processes that led to the issuance of the Final Award have denied [Petrobras] in this proceeding the fundamental fairness and due process protections meant to be provided to arbitrating parties by Sections 10(a)(1), 10(a)(2), 10(a)(3), 10(a)(4), and Chapters 2 and 3 of the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*

In July 2018, Vantage filed a petition to confirm the arbitration award in the United States District Court for the Southern District of Texas. Petrobras opposed confirmation and moved the district court to vacate the

award. To support its motion for vacatur, Petrobras sought leave to depose Gaitis. Petrobras claimed that the additional testimony would provide a more complete record on which the district court could evaluate the arbitral award. After a hearing in December 2018, the district court denied the motion to subpoena Gaitis. Two months later, Petrobras moved for leave to serve a subpoena on the AAA. Petrobras sought the AAA's documents in connection with the challenges to Brower in the arbitration. The district court also denied that motion.

In May 2019, the district court denied the motion to vacate and granted Vantage's petition to confirm the award. The court entered final judgment and ordered Petrobras to pay $733,968,000 (the arbitration award plus interest), and post-judgment interest. Petrobras appealed.

## DISCUSSION

This case implicates Chapter 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 301–307, which governs nondomestic arbitration awards subject to the Inter-American Convention on International Commercial Arbitration of January 30, 1975, T.I.A.S. No. 90-1027, *reprinted following* Pub. L. 101-369, 104 Stat. 448 (1990) (the "Panama Convention"). The FAA requires that a court confirm an arbitration award unless there is a ground for refusing to enforce the award as specified in the Panama Convention. 9 U.S.C. § 207; *see id.* § 302 (applying Section 207 to cases governed by Panama Convention). The Supreme Court has recognized an "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). "A court may not review the merits of an [arbitration] award — it must accept the facts found by the arbitrator and the arbitrator's interpretation of the contract and applicable law." *Manville Forest Prods. Corp. v. United Paperworkers Int'l Union*, 831 F.2d 72, 74 (5th Cir. 1987).

No. 19-20435

We review the district court's legal determinations *de novo* and findings of fact for clear error. *Hughes Training Inc. v. Cook*, 254 F.3d 588, 592 (5th Cir. 2001). Review of the underlying arbitral award is "exceedingly deferential," though. *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 674 (5th Cir. 2012). Although we "grant arbitrators considerable leeway when reviewing most arbitration decisions," we do not "give *extra* leeway to district courts that uphold arbitrators." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 948 (1995).

Petrobras argues that public policy precluded confirming the arbitration award. Petrobras also argues that the district court's denial of its discovery motions led the court to base its confirmation order and denial of vacatur on an incomplete record. Vacatur is warranted, Petrobras contends, because the arbitrators failed to issue a "reasoned award" as to Petróleo Brasileiro. In addition to responding to Petrobras's arguments, Vantage argues that Petrobras waived its right to appeal. We will start by addressing the appeal waiver. Because in the end we do not need to decide that question, we then turn to Petrobras's claims of error.

I.    *Appeal waiver*

A valid appeal waiver does not deprive the court of jurisdiction; accordingly, if affirming the judgment is a clearer resolution than deciding the validity of the appeal waiver, we can affirm. *See In re Deepwater Horizon*, 934 F.3d 434, 441 (5th Cir. 2019). The waiver appears in the Third Novation: "The Parties waive irrevocably their right to any form of appeal, review or recourse to any court or other judicial authority, to the extent that such waiver may be validly made." Courts "rigorously enforce arbitration agreements according to their terms." *American Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013). Contractual clauses must be "clear and unequivocal," though, in order

7

No. 19-20435

to waive a right. *Ensco Int'l, Inc. v. Certain Underwriters at Lloyd's*, 579 F.3d 442, 443 (5th Cir. 2009) (waiving the right to removal)

Vantage reasons that because federal and Texas law enforce appeal waivers, we should enforce the appeal waiver here. *See id.*; *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 69 n.1 (Tex. App.— Houston [14th Dist.] 2016, no pet.). To be clear, Vantage does not argue on appeal that the Third Novation barred the district court's review of the award, only that *appellate* review of the district court's judgment is barred. Petrobras replies that it could not waive its right to appeal under the Panama Convention or the FAA and that there was no clear and unequivocal indication of waiver.

The parties cite competing persuasive authorities from other circuits. The Ninth Circuit held that "the statutory grounds for vacatur in the FAA may not be waived or eliminated by contract." *In re Wal-Mart Wage & Hour Emp. Practices Litig.*, 737 F.3d 1262, 1268 (9th Cir. 2013). The court was rejecting a waiver clause that would have precluded *all* federal-court review. *Id.* at 1266 n.3. Because parties may not contract for expanded judicial review, *see Hall St.*, 552 U.S. at 578, the Ninth Circuit reasoned that private agreements eliminating judicial review of arbitration awards also are not enforceable. *Wal-Mart*, 737 F.3d at 1267.

The Second Circuit stated that those "seeking to enforce arbitration awards through federal-court confirmation judgments may not divest the courts of their statutory and common-law authority to review both the substance of the awards and the arbitral process for compliance with § 10(a)." *Hoeft v. MVL Grp., Inc.*, 343 F.3d 57, 66 (2d Cir. 2003), *overruled on other grounds by Hall St. Assocs. L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008).

The Tenth Circuit enforced the following contractual provision that it considered to waive appellate review only: "Judgment upon the award rendered by the arbitrator shall be final and nonappealable and may be

8

entered in any court having jurisdiction thereof." *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 827 (10th Cir. 2005). The court concluded "that contractual provisions limiting the right to appeal from a district court's judgment confirming or vacating an arbitration award are permissible, so long as the intent to do so is clear and unequivocal." *Id.* at 830.

Vantage argues that *MACTEC* supplies the applicable rule while Petrobras calls that rule "legally doubtful." Petrobras instead would have us extend *Wal-Mart* to waivers of appellate review as well. Petrobras further contends that parties cannot contractually deprive this court of its authority to review arbitration awards.

The parties agree that if the waiver clause barred all federal court review — namely, the ability to oppose confirmation and move for vacatur in district court — then the waiver would not be enforceable. The waiver provision in the DSA, unlike the one in *MACTEC*, states that the waiver applies only to the extent legally permissible. *MACTEC*, 427 F.3d at 829. This does not make the waiver equivocal. The "to the extent" clause preserves valid applications of the appeal waiver, even if other applications of the clause are invalid.

*Wal-Mart* neither contradicted nor endorsed *MACTEC*; the two cases dealt with different issues. *Wal-Mart*, 737 F.3d at 1266 n.3. We are inclined to think the Tenth Circuit's approach is persuasive. Still, if the district court's judgment is affirmable on the merits, we do not need to discern the law for this circuit on such appeal waivers. We therefore will now examine the merits.

II.   *Motion to confirm*

Article V(2)(b) of the Panama Convention allows a country to refuse to recognize or execute an arbitration decision under the Convention if "the recognition or execution of the decision would be contrary to the public policy" of that country. The party asserting the public policy defense bears the burden

9

of proving United States public policy would be violated by enforcing the award. *Asignacion* v. *Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1016–17 (5th Cir. 2015). "The public policy defense is to be 'construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice.'" *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara (Karaha Bodas II)*, 364 F.3d 274, 306 (5th Cir. 2004). Further, a public policy rendering a contract unenforceable "must be 'explicit,' 'well defined,' and 'dominant.' It must be 'ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *East Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000) (quoting *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983)). The public policy defense under the Panama Convention is "substantively identical" to the one set forth in the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, commonly called the "New York Convention." *See, e.g.*, *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 933 (D.C. Cir. 2007).

Petrobras argues that enforcing the arbitration award violates United States public policy because the award requires Petrobras to pay damages based on a contract illegally procured through bribery. Even if this country's public policy would bar enforcement of such contracts, the district court relied on the arbitrators' findings, first, that Petrobras had not proved Vantage was guilty of bribery and, second, that Petrobras "knowingly ratified the DSA." Accepting those fact findings, the district court then considered whether public policy would bar enforcing a bribery-procured but ratified contract. The court accepted another district court's rejection of a public policy defense if both parties engaged in the same fraudulent misconduct. *See Tamimi Glob. Co. v. Kellogg Brown & Root L.L.C.*, No. CIV.A. H-11-0585, 2011 WL 1157634, at \*3 (S.D. Tex. Mar. 24, 2011). Because both Vantage and Petrobras allegedly

No. 19-20435

engaged in misconduct, and the contract was later ratified, the district court concluded there was no public policy impediment to enforcement.

### A.    *How much deference*

The first question on this issue is whether the district court erroneously deferred to the arbitrators' ratification finding. Petrobras asserts that the district court mistakenly deferred to the arbitrators' public policy conclusions rather than reviewing those conclusions *de novo*. Petrobras does not dispute that if ratification occurred, then enforcing the arbitration award does not violate public policy; rather, Petrobras argues that the arbitrators' findings do not amount to legal ratification.

"Under the New York Convention, the rulings of the Tribunal interpreting the parties' contract are entitled to deference." *Karaha Bodas II*, 364 F.3d at 290. "The court may not refuse to enforce an arbitral award solely on the ground that the arbitrator may have made a mistake of law or fact." *Id.* at 288. This is because "[t]he parties did not bargain for the facts to be found by a court, but by an arbitrator . . . . Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 45 (1987).

Petrobas relies on one of this court's opinions to support that the district court should have considered the public policy issue *de novo*. *See Gulf Coast Industries Workers Union v. Exxon Co.*, 991 F.2d 244, 248 n.5 (5th Cir. 1993). The case involved a dispute about whether an employee was discharged for just cause. *Id.* at 247. We stated that a court "enjoy[s] more latitude in reviewing the arbitrator's decision" when public policy violations are alleged. *Id.* at 249. A court defers to an arbitrator's findings of fact "but review[s] his conclusions *de novo*," because "[c]ourts are the ultimate arbiters of public policy, not arbitrators." *Id.* at 248 n.5, 249. The Supreme Court has similarly stated that "the question of public policy is ultimately one for resolution by the

courts." *W.R. Grace & Co.*, 461 U.S. at 766. Still, courts must "tak[e] the facts as found by the arbitrator." *Gulf Coast*, 991 F.2d at 249. The *Gulf Coast* arbitration award would have reinstated an employee to a position working with dangerous equipment. *Id.* at 250, 255. Though it was clear that an employee's use of a controlled substance violated public policy, the problem with the arbitration award was elsewhere. Public policy prohibited reinstating a worker who posed a safety hazard. *Id.* at 250, 255. We set aside the reinstatement of the worker under *de novo* review of public policy. *Id.* at 257.

Petrobras is not seeking our review of whether the final award violated public policy. Instead, Petrobras wants us to decide whether the underlying contract violated public policy. Petrobras questions whether any ratification occurred that would obviate any public policy problem in the DSA. We agree with the district court that "[t]he public policy exception cannot be used to simply question the merits of the underlying award." *Hardy Expl. & Prod., (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas*, 314 F. Supp. 3d 95, 109 (D.D.C. 2018).

The Second Circuit applied this principle in *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310 (2d Cir. 1998). We have cited *Europcar* favorably for the proposition that a reviewing court should not reconsider an arbitrator's findings. *Karaha Bodas II*, 364 F.3d at 288 n.2. In *Europcar*, the appellant argued enforcing an arbitration award would violate public policy where the award was based on an allegedly forged agreement. 156 F.3d at 315. The Second Circuit distinguished between fraud that may lead to application of the public policy exception under the Convention and fraud that would not:

> [The defendant-appellant] has apparently confused the issue of a fraudulently obtained arbitration agreement or award, which might violate public policy and therefore preclude enforcement, with the issue of whether the underlying contract that is subject of

the arbitrated dispute was forged or fraudulently induced — a matter to be determined exclusively by the arbitrators.

*Id.* (citations omitted). The *Europcar* court observed that the appellant did not dispute the validity of the supplemental arbitration agreement. *Id.* Further, the appellant could not "seek to relitigate" the arbitrators' determination of whether the parties' underlying agreement was forged — even if the arbitrators had made an error of law or fact. *Id.* at 315–16. "[W]hether the underlying contract that is the subject of the arbitrated dispute was forged or fraudulently induced" was a question for the arbitrators and was not the basis of a public policy defense. *Id.* Therefore, enforcing the arbitration award did not violate public policy. *Id.* at 316.

Like the underlying conduct in *Gulf Coast*, the underlying conduct here, bribery, does violate public policy. *See* 991 F.2d at 250. Unlike in *Gulf Coast*, though, enforcing the arbitration award does not create a situation contrary to public policy, such as putting anyone's safety at risk. The arbitrators found Petrobras ratified the DSA. When we defer to that finding, the legal conclusion follows that the DSA, and the arbitration award, did not violate public policy.

Further, as in *Europcar*, the arbitration agreement here is external to the underlying contract and the arbitration agreement's validity is not disputed. 156 F.3d at 315. Also, both in *Europcar* and here, the arbitrators had the power to rule on the underlying contract's validity. *Id.* The arbitration clause in the Third Novation provided that the arbitrators would have power to rule on the existence and validity of the DSA. Whether a contract should be voided because of bribery is a question about the validity of the DSA. The tribunal answered that question when it found that Petrobras ratified the DSA and thus waived bribery objections. The arbitrators also found that Petrobras had not established that "Vantage knew of or participated in any bribery." These findings were within the tribunal's authority to rule on the DSA's

validity.    As such, the validity of the DSA was rightly a question for the arbitrators rather than the district court.

Petrobras also argues that the district court and the arbitrators relied on a flawed definition of ratification.  Even if that is so, mistakes of law or fact are not grounds for denying confirmation. *Karaha Bodas II*, 364 F.3d at 288.

We conclude that the district court did not engage in inappropriate deference to the arbitrator's decision.

### B.    *"Mutual misconduct"*

Petrobras also takes issue with what it perceives as the district court's ultimate conclusion that "[i]t does not violate public policy to enforce an arbitration award against parties who were alleged to have mutually engaged in mutual misconduct during the formation of a contract, particularly when that contract was later ratified."  Petrobras disputes that Petrobras engaged in misconduct in the contracting process and that mutual misconduct does not override public policy defenses.  Mutual misconduct was not the basis of the district court's confirmation order, though.   The district court accurately defined ratification, recognized the arbitrators' ratification finding, and thus concluded that "Petrobras has not met its burden of showing that the Tribunal's contract interpretation violates some explicit public policy."  The court continued:

> Petrobras's attempt to relitigate the merits of its contract dispute and the general appeal to public policy against paying and accepting bribes to form contracts does not meet the high burden of showing that enforcement of the actual arbitration decision in this case would violate the most basic notions of morality and justice.

The district court did not base its decision just on "mutual misconduct."  We also need not concern ourselves with the precise reasoning by the district court, because we review *de novo* whether the award should have been confirmed.

14

*Asignacion*, 783 F.3d at 1014–15.    There was no public policy bar to confirmation.

## III.    *Discovery motions*

District courts occasionally allow discovery in vacatur and confirmation proceedings.  *See* FED. R. CIV. P. 81(a)(6)(B).  Previously we have endorsed a flexible inquiry for district courts to use when assessing discovery requests in the context of such proceedings: "the court must weigh the asserted need for hitherto undisclosed information and assess the impact of granting such discovery on the arbitral process." *Karaha Bodas II*, 364 F.3d at 305 (quoting *Lummus Glob. Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.*, 256 F. Supp. 2d 594, 626 (S.D. Tex. 2002)).  The court should focus on "specific issues raised by the party challenging the award and the degree to which those issues implicated factual questions that cannot be reliably resolved without some further disclosure." *Id.*  "The party seeking discovery bears the burden of showing its necessity." *Freeman v. United States*, 556 F.3d 326, 341 (5th Cir. 2009).  Moreover, "[t]he loser in arbitration cannot freeze the confirmation proceedings in their tracks and indefinitely postpone judgment by merely requesting discovery." *Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F.2d 334, 337 (5th Cir. 1976).  We review a district court's order denying discovery for an abuse of discretion.  *JP Morgan Chase Bank, N.A. v. Datatreasury Corp.*, 936 F.3d 251, 255–56 (2019).

Two refusals to subpoena witnesses are at issue.  First, the district court disallowed a deposition of Gaitis, the dissenting arbitrator.  Second, the court refused to authorize a *subpoena* on the AAA itself, regarding its investigation into the request to disqualify Judge Brower.  We discuss both.

### A.    *Motion for leave to depose Gaitis*

Petrobras asserts that discovery was necessary to resolve the question of the arbitrators' bias and that "glaring red flags" in the record indicate evident

partiality and misconduct, 9 U.S.C. § 10(a)(2), (3).  Before identifying these red flags, we will address the parties' agreement not to depose the arbitrators.

When an organization's arbitration rules are incorporated into the underlying agreement, those rules are treated the same as any other contractual provision.  *See C & L Enters., Inc. v. Citizens Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 419 n.1 (2001).  We seek to "give effect to the intent of the parties," including to any contractual limitations.  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010).

Here, the arbitration clause in the Third Novation incorporates the AAA's Commercial Arbitration Rules.  Rule 52(e) of the AAA's rules provides that "[p]arties to an arbitration under these rules may not call the arbitrator . . . as a witness in litigation or any other proceeding relating to the arbitration" and an arbitrator is "not competent to testify as [a] witness[] in such proceeding."  Vantage says this provision was enforceable, so the district court did not abuse its discretion in denying Petrobras's motion.  Petrobras does not raise any general contract defenses against enforcing Rule 52(e), but it asserts that enforcing the rule here would "eviscerate the integrity of the arbitral process."  This general policy concern does not persuade us that the district court erred in enforcing the incorporated terms of the contract.

Further, even without Rule 52(e), Petrobras was not entitled to depose Gaitis.  Petrobras points to the unusual and strong statement in the dissent: that the entire arbitration, "the prehearing, hearing, and posthearing processes," denied Petrobras "fundamental fairness and due process protections."  Petrobras also claims that several moments during the arbitration hearings substantiate the dissent's assertion, such as when Judge Brower made comments that Petrobras perceived as hostile to Petrobras.  For example, Judge Brower allegedly made off-the-record comments such as "already talked about" and "asked and answered."  We agree with the district

court's view of these matters: "Although Petrobras may feel that the comments allegedly made by Judge Brower were abrasive, critical, or rude, these same comments can be viewed as Judge Brower's efforts to move the proceeding along . . . ."

The examples of Judge Brower's allegedly biased conduct at the hearings do not establish that the district court abused its discretion when it refused to allow Petrobras to depose Gaitis. We have not discovered any court of appeals decision holding that a district court abused its discretion in denying discovery from an arbitrator about the substance of the award. We see nothing in this record to cause us to be the first.

### B.    *Motion to subpoena the AAA*

After the district court denied the motion for leave to subpoena Gaitis, Petrobras moved for leave to serve a subpoena on the AAA. Petrobras sought to discover documents from the AAA's investigation into Judge Brower's alleged bias. That investigation occurred because Petrobras moved to disqualify Judge Brower after the merits hearing.

First, we conclude that the AAA's ultimate finding that Judge Brower was *not* biased is hardly a "red flag" indicating that discovery was needed. Likewise, the arbitral record did not show signs of partiality or misconduct that compelled the district court to delay the case in order for Petrobras to serve a subpoena on the AAA.

It is relevant that there was no motion for this discovery against the AAA until all the parties had finished briefing the respective motions to confirm and vacate. It is true the deadlines for discovery and for new motions were still ahead. The discovery motion came, though, only a few weeks before the merits hearing on the motions to confirm and to vacate. Although Petrobras's motion was not technically overdue, the district court reasonably considered that

17

additional discovery would cause further delay to the final resolution of the case. *See Karaha Bodas II*, 364 F.3d at 304.[1]

Moreover, several circuits have held that arbitral immunity extends to organizations like the AAA. *Olson v. Nat'l Ass'n of Sec. Dealers*, 85 F.3d 381, 382 (8th Cir. 1996); *New England Cleaning Servs. v. AAA*, 199 F.3d 542, 545 (1st Cir. 1999). In an unpublished decisions, a panel of this court found arbitral immunity for the AAA. *Jason v. AAA, Inc.*, 62 F. App'x 557 (5th Cir. 2003).

Regardless of the exact dimensions of arbitral immunity, Petrobras has not shown that the district court abused its discretion in denying the discovery motions.

## IV.  *Motion to vacate*

The extent of judicial review of arbitral awards under the Panama Convention depends in part on where the award was made. Relevant in this case is that when the United States is the country of primary jurisdiction, meaning the country where the arbitration took place, our courts "have much broader discretion to set aside an award." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara (Karaha Bodas I)*, 335 F.3d 357, 368 (5th Cir. 2003). The arbitration at issue here was held in Texas, so the district court could entertain Petrobras's motion to vacate the award "in accordance with the country's domestic arbitral law and its full panoply of express and implied grounds for relief." *Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 746 (5th Cir. 2008).

---

[1] In an unpublished decision, this court considered the denial of discovery that was first requested after all the merits briefs were filed and after the agreed-to discovery deadline. *Woods v. P.A.M. Transp. Inc.-L.U.*, 440 F. App'x 265, 268 (5th Cir. 2011). We emphasized that discovery cannot be used just to delay confirmation proceedings, "particularly considering the strong policy favoring expeditious enforcement of arbitration awards." *Id.* That reasoning appears sound to us.

No. 19-20435

Petrobras moved to vacate the arbitration award based on Section 10(a)(2), (3), and (4) of the FAA.[2]  Under Section 10(a)(2), Petrobras argued Judge Brower's alleged bias indicated partiality.  Under Section 10(a)(3), Petrobras argued the tribunal had failed to consider certain evidence.  Last, under Section 10(a)(4), Petrobras argued that the award was not reasoned with respect to Petróleo Brasileiro.  The district court disagreed on each point.  On appeal, Petrobras argues that the district court should not have denied the vacatur motion with respect to subsections (a)(2) and (a)(3) without first allowing discovery.  We already held that the district court did not abuse its discretion in denying the discovery motions, and Petrobras raises no other arguments in support of vacatur under Section 10(a)(2) and (3).

What remains is Petrobras's argument under Section 10(a)(4).  That section provides for vacatur "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).  An argument for vacatur under Section 10(a)(4) must be balanced against the parties' agreement to have arbitrators interpret their agreement, which means that

---

[2] Although the FAA provides default rules, parties can contract to apply other rules. *Volt Info. Scis., Inc. v. Bd. of Trustees*, 489 U.S. 468, 474–75 (1989).  Here, the dispute-resolution section of the Third Novation contains a choice-of-law provision selecting Texas law.  Thus, one might ask whether Texas or federal vacatur standards apply.  *See BNSF Ry. Co. v. Alstom Transp., Inc.*, 777 F.3d 785, 790–91 (5th Cir. 2015).  In one case, we found federal vacatur standards applied because the choice-of-law clause did not expressly reference California's arbitration law.  *Cooper v. WestEnd Capital Mgmt., L.L.C.*, 832 F.3d 534, 544 (5th Cir. 2016).  Here, though, the choice-of-law clause is specific to the "arbitration provisions" of the Third Novation.  Although the clause does not name the Texas General Arbitration Act, the clause is expressly about arbitration, and the clause is in the section establishing how the parties may enforce an arbitration award.  We are therefore not persuaded that the FAA's vacatur standards are the right ones to apply in this case.  Texas and federal vacatur standards do not significantly differ, though, *compare* 9 U.S.C. § 10, *with* Tex. Civ. Prac. & Rem. § 171.088, and the parties discuss only the federal vacatur standards.  Because the relevant bases for vacatur exist in both federal and state law, we will consider the arguments under the FAA as presented by the parties.

"an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's views of its (de)merits." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (quotation marks omitted).   "[T]he substantive question of whether an arbitrator has exceeded his arbitration powers is a function of [our] highly deferential standard of review in such cases: an arbitrator has not exceeded his powers unless he has utterly contorted . . . the essence of the contract." *Timegate Studios, Inc. v. Southpeak Interactive, L.L.C.*, 713 F.3d 797, 802–03 (5th Cir. 2013).  In other words, the arbitrator exceeds his authority where he acts "contrary to an express contractual provision." *PoolRe Ins. Corp. v. Organizational Strategies, Inc.,* 783 F.3d 256, 265 (5th Cir. 2015).  We resolve any doubts in favor of arbitration.  *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 472 (5th Cir. 2012).

The Third Novation specified that the arbitrators were required to "render a reasoned award in writing."  In one recent opinion, we outlined a "reasoned award" continuum.  *YPF S.A. v. Apache Overseas, Inc.*, 924 F.3d 815, 820 (5th Cir. 2019).  There is no specific definition of the term, but it requires "something short of findings and conclusions but more than a simple result." *Id.* (quoting *Sarofim v. Trust Co. of the W.*, 440 F.3d 213, 215 n.1 (5th Cir. 2006)).  In other words, we ask whether the arbitrators "issued more than a mere announcement." *Id.*

Petrobras argues that the arbitration award was not reasoned at least as it relates to Petróleo Brasileiro.  That company is not a party to the DSA or its amendments but rather is party to the Form of Payment and Performance Guaranty.  Thus, Petróleo Brasileiro contested the arbitrators' jurisdiction. The guaranty says that the laws of England and Wales apply to disputes arising out of the document.  Under English law, Petrobas argued that Vantage's claim against Petróleo Brasileiro was "premature because the Guaranty is a secondary suretyship obligation, not an independent first

demand instrument." Vantage, though, argued that Petróleo Brasileiro was bound to all the provisions of the parties' agreements, including the arbitration clause in the Third Novation. Vantage also argued that the guaranty's choice-of-law clause was superseded by the Third Novation's.

On appeal, Petrobras argues that the arbitration award was not reasoned because it did not address the arguments that the guaranty did not create immediate liability for Petróleo Brasileiro. The arbitrators determined that because Petróleo Brasileiro was a "primary obligor under the DSA and the Guaranty," Petróleo Brasileiro "remain[ed] responsible for breaches of [the DSA]." The arbitration award discusses whether Petróleo Brasileiro was a proper defendant, explaining the claimants' position, the respondents' position, and the tribunal's own analysis. This is "more than a simple result." *Sarofim*, 440 F.3d at 215 n.1. Or "[i]t is, at the very least, doubtful that the award is not more than a simple result." *Rain CII Carbon*, 674 F.3d at 474. Accordingly, vacatur as to Petróleo Brasileiro was not warranted.

AFFIRMED.