# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 13, 2023

Lyle W. Cayce
Clerk

No. 23-30047

Daniel Gonzales Llagas,

*Plaintiff—Appellant*,

*versus*

Sealift Holdings, Incorporated; Sealift, Incorporated;
Black Eagle Shipping, L.L.C.; Fortune Maritime, L.L.C.;
Sealift Tankships, L.L.C.; Sagamore Shipping, L.L.C.;
Remington Shipping, L.L.C.,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:17-CV-472

_____

Before Richman, *Chief Judge*, and Haynes and Duncan, *Circuit Judges*.

Per Curiam:[*]

Plaintiff appeals the district court's orders compelling arbitration and enforcing an arbitration award. For the reasons set forth below, we AFFIRM.

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-30047

## I.  Background

### A. Facts

Daniel Gonzales Llagas is a Philippine citizen who worked as a fitter performing steelwork and repairing machinery on several different United-States-flagged ships.  According to Llagas, the Sealift Defendants[1] are a single business enterprise that owns each of the ships on which he worked.

Rather than directly employing Filipino seamen, like Llagas, the Sealift Defendants used Lots International, Inc. to source labor from the Philippines via Magsaysay Maritime Corporation (collectively, the "Manning Agents").  That is because "[t]he Philippine government requires foreign employers or their agents to employ Filipino workers through the Philippine Overseas Employment Administration (POEA), a department of the Ministry of Labor and Employment."  *Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 900 (5th Cir. 2005).  According to Llagas, Magsaysay "is licensed by [POEA] as a manning agent with authority to recruit Filipino seamen for employment on board vessels accredited to it," and the contracts at issue indicate that Magsaysay is an agent of Lots.  For each stint on the Sealift Defendants' ships, Llagas signed an employment contract with the Manning Agents (the "POEA Contracts").  The Sealift Defendants did not have a contract with the Manning Agents but did receive monthly invoices from Lots so that Lots could pay Llagas and others for their work aboard the Sealift Defendants' vessels.

Each POEA Contract establishes the terms of Llagas's employment, including dates of employment, basic wages, hours of work, fixed overtime, and leave pay.  The contracts also incorporate POEA's "Standard Terms and

---

[1] The term "Sealift Defendants" refers to all the defendants.

Conditions Governing the Overseas Employment of Filipino Seafarers On-Board Ocean-Going Ships." One such term is Section 29's arbitration clause, which mandates arbitration for "claims and disputes arising from this employment." Another such term is Section 31's requirement that "[a]ny unresolved dispute, claim or grievance arising out of or in connection with this contract . . . shall be governed by the laws of the Republic of the Philippines, international conventions, treaties and covenants to which the Philippines is a signatory."

## B. Procedural History

Originally, Llagas filed a class action in Louisiana state court against the Sealift Defendants. Llagas did not name either of the Manning Agents as a defendant. The lawsuit alleges violations of 46 U.S.C. §§ 8106, 8701, and 10302, and seeks remedies provided by 46 U.S.C. §§ 10313 and 11107. The petition also states that "[c]ontrary to United States statutory law, and the General Maritime Law . . . the Sealift Defendants failed to make payments of the full wages due to Plaintiff and the class he seeks to represent." The Sealift Defendants removed the lawsuit to federal court.

Shortly thereafter, the Sealift Defendants filed a Motion to Stay Litigation and Compel Arbitration based on the arbitration clause incorporated into the POEA Contracts. The magistrate judge recommended that the court compel arbitration. The magistrate judge concluded that, despite the Sealift Defendants not having signed the POEA Contracts, Llagas should be compelled to arbitrate based on the equitable-estoppel doctrine set out in *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524 (5th Cir. 2000).

Llagas filed an objection to the magistrate judge's report and recommendation, arguing that the magistrate judge mistook his claims as seeking wages due under the POEA Contracts (rather than alleging violations of statutory law alone) and therefore erroneously applied the doctrine of

equitable estoppel. Simultaneously, Llagas filed a stipulation disavowing any reliance on the POEA Contracts except to the extent the documents signed violated 46 U.S.C. § 11107. In light of Llagas's stipulation, the district court remanded to the magistrate judge the Sealift Defendants' motion to compel arbitration.

Upon remand, the magistrate judge issued a supplemental report and recommendation concluding that Llagas should be compelled to arbitrate because his statutory claims were intertwined with his employment contracts. The district court agreed and issued a judgment compelling arbitration. Llagas filed a motion to reconsider, which the district court granted in part by issuing an amended judgment clarifying the reasoning of the court but not altering the result. The amended judgment clarified that "Plaintiff's claims in this case 'rely on the terms of the written agreement' (the Employment Contract) because each of his claims 'makes reference to or presumes the existence of the written agreement' and thus[ ']arise out of and relate directly to the written agreement.'"

As a result of the order requiring arbitration, Llagas filed a petition with the National Conciliation and Mediation Board (NCMB). However, in doing so, he named not just the Sealift Defendants as respondents but also Magsaysay and Marlon R. Rono, the President of Magsaysay. He also asserted causes of action similar to the same statutory violations as those alleged in his original petition. The matter was ultimately transferred to the National Labor Relations Commission (NLRC). On the NLRC's complaint form, Llagas listed Magsaysay in the space for "Name of Respondent Agency," Marlon R. Rono in the space for "Name of Owner/Manager/President," and Sealift Holdings, Inc. in the space for "Name of Respondent Principal." In the causes of action section of the form, Llagas checked boxes for: (1) illegal dismissal – others (please specify), (2) money claims non-payment, (3) underpayment – salaries/wages, (4)

No. 23-30047

underpayment – overtime pay, and (5) others (please specify). Disregarding the form's instructions, he did not provide any additional information about his "other" causes of action in the spaces provided to do so.

In addition to his NLRC complaint, Llagas also filed a position paper with the NLRC. Unlike his NLRC complaint, which did not allege the relevant statutory violations, Llagas's position paper includes causes of action for violations of the same United States statutes alleged in his original state-court petition.

The arbitrator rendered a decision against Llagas. The Sealift Defendants then moved for the district court to recognize and enforce the arbitration decision. The district court granted the motion and issued a judgment in favor of the Sealift Defendants on all claims, declining to reconsider. Llagas timely appealed.

## II.    Jurisdiction & Standard of Review

The district court had federal question jurisdiction under 28 U.S.C. § 1331 based on Llagas's statutory claims.[2] The district court also had removal jurisdiction under 9 U.S.C. § 205. We have jurisdiction pursuant to 9 U.S.C. §§ 16(a)(1)(D) and (a)(3).

We "review[] an order compelling arbitration de novo," *Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 256 (5th Cir. 2014) (quotation omitted), but review the "use of equitable estoppel to compel arbitration for an abuse of discretion." *Id.* "To constitute an abuse of discretion, the district court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence

---

[2] Llagas also contends that the district court had diversity jurisdiction, but the notice of removal does not properly plead the citizenship of the parties that are LLCs.

that is clearly erroneous." *Id.* (quotation omitted). We "may affirm the district court on any ground supported by the record." *Id.* at 256–57 (quotation omitted).

We review a district court's confirmation of an arbitration award de novo. *YPF S.A. v. Apache Overseas, Inc.*, 924 F.3d 815, 819 (5th Cir. 2019). But "[r]eview of the underlying arbitral award is exceedingly deferential." *Vantage Deepwater Co. v. Petrobras Am., Inc.*, 966 F.3d 361, 368 (5th Cir. 2020) (internal quotation marks and citation omitted).

## III.    Discussion

The two issues before us are (1) whether the district court abused its discretion by compelling arbitration based on equitable estoppel, and (2) whether the district court erred by enforcing the arbitration award. We address each issue in turn.

### A. The district court did not abuse its discretion by compelling arbitration based on equitable estoppel.

Llagas contends that the district court erroneously compelled arbitration because the Sealift Defendants are not signatories to the POEA Contracts and equitable estoppel does not apply.

A non-signatory may compel arbitration based on the equitable-estoppel doctrine under the intertwined-claims basis in two independent circumstances: (1) when the claims rely on the terms of the contract, or (2) when the claims arise out of interdependent and concerted misconduct. *See Grigson*, 210 F.3d at 527 (adopting the Eleventh Circuit's framework).[3] When "both independent bases" exist, "equitable estoppel is much more

---

[3] Neither party disputes that this body of law governs the equitable-estoppel determination.

readily applicable." *Id.* at 527–28.  The Sealift Defendants contend that both bases for equitable estoppel exist in the present case.  We agree.

### 1. *Reliance on the terms of the contract*

The first basis for equitable estoppel under *Grigson*—reliance on the terms of the contract—is the basis on which the district court compelled arbitration.  We hold that the district court did not abuse its discretion in doing so.

"[E]quitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory."  *Grigson*, 210 F.3d at 527 (quotation and italics omitted).  In other words, "[w]hen each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement."  *Id.* (quotation omitted).  The theory is that a signatory to an agreement with an arbitration clause cannot "have it both ways" by, on the one hand, seeking "to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision," while, on the other hand, "deny[ing] arbitration's applicability because the defendant is a non-signatory."  *Id.* (internal quotation marks and citation omitted).

Llagas argues that the district court confused reliance on the *existence* of the POEA Contracts with reliance on the *terms* of the POEA Contracts.  Llagas contends that the district court's reasoning is at odds with *Hill v. G E Power Systems, Inc.*, 282 F.3d 343 (5th Cir. 2002).  We disagree.

In *Hill*, we held that the plaintiff's claims for trade-secret misappropriation and fraudulent inducement may have "touch[ed] matters" covered by a termination agreement that ended a business relationship

between the plaintiff and one of the defendants. 282 F.3d at 348–49. But because the non-signatory defendant "stop[ped] short of asserting that [the plaintiff] relies upon the express terms of the Termination Agreement in asserting its claims . . . the first prong of the *Grigson* test [was] not met." *Id.* at 349.

Unlike *Hill*, the claims at issue in the present case do rely on the express terms of the POEA Contracts. It is clear that Llagas would never have received this job without the POEA Contract. Further, § 11107, which provides the remedy for each of Llagas's claims, relies on the express terms of the POEA Contracts because it looks to "the amount agreed to be given the seaman at the time of engagement" as one of two potential remedies when a seaman's employment violates the law.[4] Llagas contends that because the alternative remedy under § 11107—"the highest rate of wages at the port from which the seaman was engaged"—does not rely on the express terms of the contract, § 11107 does not provide a basis for equitable estoppel. But even if the port rate, rather than the contractual rate, is the remedy awarded, a court still must evaluate "whichever is higher" by comparing the express terms of the POEA Contract with the highest rate available at the port; that is particularly true here, where Llagas admitted he was paid the

---

[4] Moreover, § 11107 is not the only statute at issue that meets *Grigson*'s first test. Under § 8701(b), "[a] person may not engage or employ an individual, and an individual may not serve, on board a vessel to which this section applies if the individual does not have a merchant mariner's document." Further, § 8106(c) sets a maximum limit of 60 days in a calendar year "that the owner or operator of a vessel . . . may employ on board riding gang members who are neither United States citizens nor aliens lawfully admitted to the United States for permanent residence for work on board that vessel." Finally, § 10302(a) states that "[t]he owner, charter, managing operator, master, or individual in charge shall make a shipping agreement in writing with each seaman before the seaman commences employment." We agree with the district court that these statutes "presume[] the existence of" an employment agreement and therefore "arise out of and relate directly to" the employment agreements. *Grigson*, 210 F.3d at 527.

contractual wages. *See* 46 U.S.C. § 11107. This alone is a sufficient basis for equitable estoppel, especially because each of Llagas's statutory claims relies on § 11107 for a remedy.

Accordingly, the district court did not abuse its discretion by compelling arbitration under *Grigson*'s first test.

### 2. *Interdependent and concerted misconduct*

In addition to the above, the second basis for equitable estoppel also applies. Under the second basis, equitable estoppel is appropriate when a signatory "raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Grigson*, 210 F.3d at 527 (quotation omitted).

As stated above, his POEA Contract is what led him down the path at issue. Thus, here, the allegations in Llagas's complaint implicate the Manning Agents as the entities who employed Llagas and facilitated his allegedly unlawful engagement with the Sealift Defendants. The statutes on which Llagas's claims rely support this conclusion. First, §§ 8701(b) and § 8106(c) prohibit employment of a seaman under certain conditions, which directly implicates Llagas's actual employers (the signatory Manning Agents). Second, § 10302 sets requirements that must be met before a seaman begins employment. Finally, as discussed above, § 11107, which provides a remedy for each of the alleged statutory violations, prohibits "[a]n engagement of a seaman contrary to a law of the United States." We therefore hold that the alleged misconduct "raises allegations of substantially interdependent and concerted misconduct." *Grigson*, 210 F.3d at 527 (quotation omitted).

For these reasons, we conclude that the district court did not abuse its discretion by applying equitable estoppel and compelling arbitration.

## B. The district court did not violate public policy by enforcing the arbitration award.

We next consider whether the district court properly confirmed the arbitration award as requested by the Sealift Defendants. Llagas argues that the district court erred because enforcing the award violated public policy. We disagree.

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") "applies when an arbitral award has been made in one signatory state and recognition or enforcement is sought in another signatory state." *Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1015 (5th Cir. 2015) (citing the Convention, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3). The United States and the Philippines are both signatories. *Asignacion*, 783 F.3d at 1015.

A United States court with jurisdiction "shall confirm" an arbitration award governed by the Convention "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specifically specified in the said Convention." 9 U.S.C. § 207. "The Convention permits a nonsignatory to refuse to recognize or enforce an award if 'recognition or enforcement of the award would be contrary to the public policy of that country.'" *Asignacion*, 783 F.3d at 1015 (quoting Convention art. V(2)(b)). The "public policy defense is to be construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice." *Id.* at 1016 (quotation omitted). Additionally, the public-policy defense applies only for an "explicit public policy" that is "well defined and dominant" and can be "ascertained by reference to the laws and legal precedent and not from general considerations of supposed public interests." *Id.* (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 43 (1987)). Llagas bears a "heavy

burden of proof" to avoid enforcement of the arbitration award on public policy grounds. *Lim*, 404 F.3d at 905 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 17 (1972)).

"A district court's review of an award is extraordinarily narrow." *Asignacion*, 783 F.3d at 1015 (internal quotation marks and citation omitted). "Similarly, a court reviewing an award under the Convention cannot refuse to enforce the award solely on the ground that the arbitrator may have made a mistake of law or fact." *Id.* (citation omitted).

### 1. *Applying foreign law to a United-States-flagged vessel*

First, Llagas contends that it violates public policy for a foreign arbitrator to apply foreign law to the internal affairs of a United-States-flagged vessel. Llagas relies on a remark from *Lauritzen v. Larsen*, 345 U.S. 571 (1953) to support his position. In *Lauritzen*, the Supreme Court set out a seven-factor test to analyze choice-of-law questions in maritime cases and, in doing so, stated that "[e]xcept as forbidden by some public policy, the tendency of the law is to apply in contract matters the law which the parties intended to apply." 345 U.S. at 588–89. But the Court subsequently remarked that "[w]e think a quite different result would follow if the contract attempted to avoid applicable law, for example, so as to apply foreign law to an American ship." *Id.* at 589.

We previously addressed the *Lauritzen* exception in *Asignacion*. 783 F.3d at 1018–19. Like the present case, *Asignacion* dealt with a public-policy challenge to an arbitration award concerning a Filipino seaman subject to a POEA contract. *Id.* at 1013. The plaintiff in *Asignacion* argued that the arbitration award should not be enforced because the Philippines-based arbitrators, applying Philippines law, awarded him far less than he would have received under United States maritime law. *Id.* at 1016–17. To settle the choice-of-law issue, we turned to *Lauritzen* and considered its remark

condemning "choice-of-law provision[s] that attempt[] to 'avoid applicable law.'" *Id.* at 1019. We reasoned that because the terms of the POEA contract at issue mandated the application of Philippines law, the plaintiff's employee "did little, if anything, to avoid applicable law through its contract with [the plaintiff]." *Id.* On the other hand, we recognized that "the Philippine government has arguably attempted to avoid the application of foreign law to its seamen." *Id.* Ultimately, we concluded that "it is far from certain that the *Lauritzen* Court condemned such choice-of-law clauses mandated by a foreign sovereign rather than a party to the contract." *Id.*

Llagas argues that *Asignacion* is not dispositive because the vessel at issue in that case sailed under the flag of the Marshall Islands rather than the United States (even though the Marshall Islands adopts the general maritime laws of the United States). But that does not change *Asignacion*'s conclusion that the reach of the *Lauritzen* exception does not require a different outcome here, where the choice-of-law clause is "mandated by a foreign sovereign rather than a party to the contract." *Id.* at 1019. Also, the public policy at issue must be "well defined and dominant" and ascertainable "by reference to the laws and legal precedents" to warrant non-enforcement of an arbitration award. *Id.* at 1016 (quoting *United Paperworks*, 484 U.S. at 43). That is not the case here. Accordingly, Llagas has not met his "heavy burden of proof" to avoid enforcement on the basis that the arbitrator applied Philippines law. *Lim*, 404 F.3d at 905 (quoting *M/S Bremen*, 407 U.S. at 17). In any event, as discussed below, the arbitrator did address the U.S. statutes in question.

### 2. *Effective vindication of statutory remedies*

Llagas also argues that the district court erred by enforcing the arbitration award because doing so violated public policy under the effective-vindication/prospective-waiver doctrine.

The "effective-vindication" or "prospective-waiver" doctrine stems from *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985). In *Mitsubishi Motors*, the Supreme Court noted that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." 473 U.S. at 637 n.19. It added, however, that "so long as the prospective litigant effectively may vindicate its statutory cause of action in the forum, the statute will continue to serve both its remedial and deterrent function." *Id.* at 637.

Because the case at issue in *Mitsubishi Motors* had not yet been arbitrated, the Court concluded that the district court would have the opportunity at the "award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed." *Id.* at 638. The Court also stated that "[w]hile the efficacy of the arbitral process requires that substantive review at the award enforcement stage remain minimal, it would not require intrusive inquiry to ascertain that the tribunal took cognizance of the antitrust claims and actually decided them." *Id.*

According to Llagas, enforcing the arbitration award in the present case would violate public policy because the arbitrator did not take cognizance of or actually decide Llagas's statutory claims beyond holding that United States law did not apply. Given that this argument is clearly not true, because the arbitrator did address that law as we explain below, he also argues that the arbitrator's labeling that portion of his opinion as *ex gratia argumenti* precludes it from constituting an actual decision on the merits. Finally, Llagas contends that even without the *ex-gratia-argumenti* label, the arbitrator's more substantive conclusions regarding Llagas's statutory claims do not constitute an actual decision on the merits. Llagas concedes that he cannot find a standard by which to judge whether an arbitrator took

cognizance of and actually decided a claim but submits that we should apply the NLRC's 2011 Rules of Procedure.

We disagree with Llagas's contention that the arbitrator did not take cognizance of or actually decide Llagas's claims beyond holding that United States law did not apply. Besides rejecting Llagas's statutory claims on choice-of-law grounds, the arbitrator also rejected Llagas's statutory claims on procedural and evidentiary grounds.

Regarding the procedural grounds, the arbitrator noted that Llagas included his statutory claims in his position paper but not in his complaint, which only alleged "underpayment of salary/wages and overtime pay." The arbitrator explained that the "NLRC Rules of Procedure provide[] that the parties' position papers, especially that of the claimant, should only cover claims and causes of action raised in the complaint." That procedural ruling is sufficient.

Turning to the evidentiary grounds, the arbitrator stated that "[e]ven assuming *ex gratia argumenti* that the US laws invoked by complainant [are] remotely applicable, still, he miserably failed to prove by any slight of evidence that he, a Filipino seafarer is in fact considered a 'gang member' under US law." The arbitrator also noted that "Complainant even failed to discuss the requisites and conditions entitling him to benefits under said US laws and that he has complied with all the requisites entitling him to the benefits under the US laws which he invokes."

Llagas is also incorrect that the arbitrator's labeling of the evidentiary ground as *ex gratia argumenti* precludes us from concluding that the arbitrator took cognizance of and actually decided Llagas's claims. District courts often make findings of an affirmative defense but then also "assume arguendo" that such a holding is not correct and then resolve the merits. When we consider such cases, we can and do look at both. *See, e.g.*, *Wion v.*

*Quarterman*, 567 F.3d 146, 147–49 (5th Cir. 2009) (addressing district court's conclusions that petition was not time barred and that, even if it was, equitable tolling should apply).   Unsurprisingly, Llagas fails to identify any authority establishing that enforcement of an arbitration award violates public policy if the arbitrator reaches the merits of a statutory claim only in the alternative.  *See Lim*, 404 F.3d at 905 (explaining that a party seeking to avoid enforcement of an arbitration award on public-policy grounds bears a "heavy burden" (quoting *M/S Bremen*, 407 U.S. at 17)).  But even "assuming arguendo" that is a "failure to consider," Llagas ignores that the arbitrator also concluded—without any such label—that Llagas failed to prove his statutory claims in accordance with the NLRC's rules of evidence by failing to plead those claims in his complaint.

Finally, we are not persuaded by Llagas's assertion that the substantive analysis of his statutory claims does not satisfy the NLRC's decisional requirements, and therefore the district court should not enforce the arbitration award.  It is clear upon a "minimal" review that does not include an "intrusive inquiry" that the arbitrator provided three independent bases for denying Llagas's statutory claims—two of which did not rely on the inapplicability of United States law.  *See Mitsubishi Motors*, 473 U.S. at 637 (providing limits of review).  That is sufficient to avoid the concern that a contract's "choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies."  *Id.* at 637 n.19.

We therefore conclude that the effective-vindication/prospective-waiver doctrine is inapplicable to the present case.

## IV.    Conclusion

For these reasons, we AFFIRM the district court's orders compelling arbitration and enforcing the arbitration award.